FILED
U.S DISTRICT COURT
NEW ALBANY DIVISION

10 SEP 24 PM 3: 38

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
New Albany Division

LAURA OATES
2408 East Market St.
New Albany, IN 47150

     Plaintiff

v.

TELAMON CORPORATION
5560 Munford Road, Suite 201
Raleigh, NC 27612

and

TRANSITION RESOURCES CORPORATION
5560 Munford Road, Suite 201
Raleigh, NC 27612

Claim No.: _____

4 : 10 -cv- 0 1 1 4 TWP -WGH

## COMPLAINT AND REQUEST FOR TRIAL BY JURY

Now into Court through undersigned counsel comes Plaintiff, Laura Oates, and files this Complaint and Request for Trial by Jury against Defendants, Telamon Corporation and Transition Resources Corporation and alleges as follows:

### I   NATURE OF THE ACTION

Plaintiff, Laura Oates, brings this action in order to recover damages as a result of an adverse personnel action based upon:

    (a)    violations of 42 U.S.C. § 12101 *et seq.* as prohibited by the American's with Disabilities Act;

    (b)    violations of 42 U.S.C. § 12203 for prohibited retaliation;

1

(c)   violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, as a result of the discrimination and retaliation;

(d)   Ms. Oates seeks damages, costs and attorneys' fees associated with bringing this suit, as well as punitive damages, incurred as a proximate result of the Defendants' actions.

## II   JURISDICTION AND VENUE

1.  This suit is brought and jurisdiction lies pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 626(c). This suit is a legal action for damages pursuant to 42 U.S.C. §§ 2000e-3. Ms. Oates filed a claim with the United States Equal Employment Opportunity Commission in Indianapolis, Indiana on or about May 29, 2009. She received a Dismissal and Notice of Rights on or about June 29, 2010.

2.  All parties reside, may be found, or transact business within the Southern District of Indiana. All relevant acts took place within the Southern District of Indiana.

3.  This Court has personal jurisdiction over the Defendants who at all times relevant were conducting business in Floyd County, New Albany, Indiana.

4.  Venue is appropriate in this Court because of the proximity of this Court to New Albany, Indiana.

## III   PARTIES

5.  Plaintiff, Laura Oates, (hereinafter, "Ms. Oates"), is an individual of the full age of majority and resident of New Albany, Indiana.

6.  Defendant, Telamon Corporation (hereinafter "Telamon") is a North Carolina corporation authorized and doing business in Indiana.

7. Upon information and belief, Defendant, Transition Resources Corporation (hereinafter "TR") is a wholly owned subsidiary of Telamon Corporation under which Telamon conducts business in Indiana.

8. Unless otherwise individually identified, Telamon Corporation and Transition Resources Corporation shall be jointly referred to herein as "Defendants."

## IV   FACTS

9. In 1996, at age 35, Ms. Oates began to experience health problems including but not limited to weight loss, fatigue, swollen joints, and the general feeling of flu like symptoms.

10. At the time Ms. Oates worked approximately 50-60 hours per week as a retail drugstore manager.

11. After numerous tests and appointments with various specialists Ms. Oates was diagnosed with Rheumatoid Arthritis (RA).

12. After diagnosis Ms. Oates began treatment under the care of a rheumatologist who prescribed a course of treatment.

13. By 1997 Ms. Oates condition had worsened to the point that she could no longer sustain her strenuous work schedule and duties which included among other thing unloading merchandise trucks.

14. Ms. Oates's doctors told her that to experience any improvement she would have to stop working.

15. Ms. Oates informed her supervisors and was put on disability leave with her last day of work being December 20, 1997.

16. Despite continued treatment, Ms. Oates's body was not responsive to any of the drugs available at the time.

17. Ms. Oates's doctors advised her that because of her condition she could no longer work in physically demanding jobs.

18. In or about April 1998, Ms. Oates applied for Social Security Disability and was granted a disabled status.

19. At the time she was determined to be disabled, the RA factor in Ms. Oates blood measured 145, seven times the normal range of between 0-20.

20. As a result of her disability Ms. Oates was no longer able to perform in her past relevant working conditions and she had no transferable skills to perform work that was within her functional limitations.

21. To develop new skills for a job more sedentary working environment Ms. Oates enrolled in Vocational Rehabilitation Services (VR) and enrolled in classes at Indiana University Southeast (IUS) by the fall semester of the same year she was declared disabled.

22. Ms. Oates graduated in 2002 with a Bachelor's degree in Social Sciences and a 3.47 GPA.

23. From September 2002 until 2008 Ms. Oates worked off and on in a variety of jobs both within and outside her area of expertise.

24. In or about the first week of November 2008, Ms. Oates interviewed with Rhonda Kidd, Deputy State Director, for a position as a case manager for Transition Resources at the New Albany Work One facility.

25. The job responsibilities of a case manager included enrolling and providing services to eligible customers, facilitating development of customer's employability, coordinating

26. utilization of local resources, maintaining appropriate records and providing reports as required.

26. The physical requirements in the case manager job description required "the ability to sit for extended periods" and were reiterated by Ms. Kidd verbally during the interview.

27. On or about November 13th Ms. Oates received a letter offering her a case manager position with TR.

28. Ms. Oates started her position as a case manager on November 17, 2008.

29. From November 17, 2008 until late December 2008, in addition to her case manager's duties, Ms. Oates was directed to provide coverage for the Department of Workforce Development ("DWD") by, among other things assisting unemployment insurance ("UI") claimants to complete their required registration on the computerized Indiana Career Connect system, assisting them in resume` building and assisting them in performing job search activities.

30. The additional duties described in paragraph 29 were physically demanding and quick paced requiring Ms. Oates to be on her feet all day to cover approximately 15-20 computers.

31. Except for another new hire, other TR Case Managers were not required to perform these additional duties.

32. From approximately November 17th until late December Ms. Oates was not provided a desk, cubicle, chair, computer or training, for her hired position as a case manager.

33. The physically demanding activity of the additional duties caused Ms. Oates to be thrown into a flare of symptoms from the RA.

34. The flare of symptoms included but was not limited to her feet and ankles being swollen, the inability to walk and severe swelling in her hands and wrist requiring her to use a cane and/or crutch to assist her walking as well as stabilization brace for her right wrist.

35. In early January 2009 Ms. Oates's co-workers began commenting on her obvious pain and difficulty walking, and witnessed the extreme swelling in her hands.

36. In early January 2009 Ms. Oates disclosed to her co-workers that she suffered from severe RA.

37. On or about January 14th Ms. Oates disclosed to her supervisor, Rhonda Kidd, that she suffered from severe RA.

38. During the January 14th conversation Ms. Oates informed Ms. Kidd that she has been disabled with RA since 1998 and that she was now experiencing great difficulty and pain due to performing the unexpected duties of UI coverage.

39. Ms. Oates informed Ms. Kidd that the RA was now in a full flare of symptoms.

40. On or about January 28th, the supervisor of the DWD staff, Rod Haywood, distributed an email to everyone, including TR staff, regarding better use of staff time and office space.

41. In February 2009 Ms. Kidd began assigning TR employees two hour blocks of time during which they were required to cover the lab for UI claimants, cover the computer banks, or perform other duties on behalf of the DWD.

42. TR employees were also required to learn and cover front desk duties and demographics intake procedures for everyone entering the building.

43. The duties identified in paragraphs 41 and 42 were in addition to the duties as a case manager.

44. Each of the duties and appointments were scheduled in a book kept at the front desk.

45. On or about February 2nd, Ms. Oates discussed with Ms. Kidd the insurmountable physical conditions performing the additional duties and her concern of missing time as a case manager if she were required to continue these additional duties.

46. On or about February 5th, Ms. Oates notified Ms. Kidd that she needed accommodations due to her disability.

47. Ms. Oates requested the accommodations to avoid anticipated problems with tardiness or absenteeism she believed would arise directly attributable to her RA.

48. Ms. Oates told Ms. Kidd she could perform her duties as a case manager for TR if the physically demanding UI claimant coverage duties were eliminated.

49. On or about February 6th, Ms. Kidd informed Ms. Oates she must put her accommodation request in writing.

50. On or about February 10th, Ms. Oates submitted a two page written request for accommodations.

51. As a matter of last resort Ms. Oates requested a modified work schedule or a transfer/recommendation to an open part-time position with the DWD.

52. Ms. Oates included with her request a copy of the December 2002 Social Security decision which recognized her ongoing disability status.

53. Ms. Oates also requested an immediate temporary schedule to accommodate severe swelling complications which afflicted her most severely in the morning hours.

54. On or about February 10th Ms. Oates sent an email to Ms. Kidd regarding her written request for accommodations.

55. Ms. Kidd responded to Ms. Oates's February 10th email that her paperwork was being sent to HR that night and that HR would thereafter take the lead on her accommodation request.

56. Ms. Kidd further responded that a transfer/recommendation to the DWD was not an option.

57. On or about February 11th Ms. Kidd notified Ms. Oates that her accommodation request must be submitted on particular Telamon forms.

58. Ms. Kidd further advised Ms. Oates that her doctor must complete and return a form declaring Ms. Oates's disability and his opinion of her functional limitations.

59. Ms. Oates completed her forms the same day and forwarded the necessary form to her doctor.

60. After a week Ms. Oates followed up on her request with Ms. Kidd but was informed that she could not discuss the matter and that everything had been sent to HR.

61. Over the next seven weeks Ms. Kidd avoided Ms. Oates and spoke to her only in short interactions.

62. On or about February 18th Ms. Kidd distributed an email asking for referrals out of their active client cases for several positions posted by DWD.

63. Ms. Kidd's email included the part-time position for which Ms. Oates had requested a referral in her accommodation request.

64. On or about February 23rd, in an attempt to arrest the extreme nature of her symptoms and get the flare to calm down, Ms. Oates doctor prescribed a of course treatment which included prednisone and a week of light duty.

65. Ms. Oates's doctor provided her with a prescription to work a maximum of five hours per day for the week February 23rd through February 27th, which she provided to her supervisor, Ms. Kidd.

66. On or about February 25th Ms. Oates submitted another written accommodation request to Ms. Kidd regarding other accommodation possibilities.

67. Ms. Oates advised that the prescribed course of treatment had improved her condition and that she was optimistic that her requested accommodations would be successful.

68. Ms. Oates further notified Ms. Kidd that she was scheduled to see a rheumatologist March 18th for disease modifying drug therapy.

69. On or about February 27th Ms. Kidd conducted a performance review of Ms. Oates.

70. The review paperwork stated "the major objectives of the position for which the employee is being evaluated" and identified only the duties for the case manager position.

71. These duties appeared exactly as they did in the job solicitation and in the written job offer.

72. Ms. Oates was given an "improvement needed" on the issue of quality and quantity of work because of "attendance issues."

73. Ms. Oates was given an "unsatisfactory" rating for initiative, again due to attendance.

74. Ms. Oates was given an "improvement needed" for cooperation, also due to attendance issues.

75. No one informed Ms. Oates that as of March 1st she was eligible for short term disability.

76. On or about March 2nd Ms. Oates received an email from Ms. Kidd notifying her that she received the update Ms. Oates had left in her office.

77. The email further stated that until Ms. Kidd received the doctor's form she could not pursue Ms. Oates accommodation request.

78. Ms. Kidd reiterated that the DWD was a separate employer and they could not transfer employees between agencies.

79. On or about March 4th Ms. Kidd disseminated an email to TR employees noticing a meeting at which they would be asked to "commit to dedicated tasks on a regular basis."

80. On or about March 8th Ms. Kidd placed Ms. Oates on administrative probation.

81. The reason given for the probation was an identified need for improvement due to "excessive absenteeism."

82. The letter stated the corrective action was effective immediately and would include weekly monitoring of absenteeism and tardiness through March 31st.

83. Ms. Oates was expected to report to work on time and work the hours of 8:00 a.m. to 4:30p.m. Monday thru Friday.

84. Within five days following the end of the probationary period Ms. Oates would be re-evaluated and either removed from probation, continue probation, or be terminated from employment.

85. Prior to being placed on probation Ms. Oates accommodation requests were never considered or discussed.

86. On or about March 9th Ms. Kidd emailed Ms. Oates that she had received the "Documentation of Disability" form from her doctor and that a meeting needed to be scheduled.

87. The email further stated that the meeting would be held to identify potential accommodations and that coordination with vocational rehabilitation was mandatory.

10

88. Ms. Oates was allowed to have a witness sit in on the meeting.

89. The email also requested Ms. Oates to provide Ms. Kidd with her vocational rehab counselor's contact information.

90. Ms. Kidd wanted to schedule the meeting for March 11th at 10:00 a.m. or March 12th at 1:00 p.m.

91. On or about March 9th a Telamon representative, Thomas Roberts, notified Ms. Oates via email that a copy of her performance appraisal was available.

92. On or about March 10th Ms. Kidd emailed Ms. Oates instructing her to verify that she had read the administrative probation action.

93. Ms. Oates responded that she had read the administrative probation action and that she intended to appeal the decision due to the fact that it came during a pending accommodation request.

94. On or about March 10th, Ms. Oates contacted vocational rehabilitation to schedule the meeting between her counselor and Ms. Kidd and was informed that her counselor was out on medical leave.

95. Ms. Oates was further advised that March 23rd was the earliest date she may be able to contact my counselor.

96. Ms. Kidd emailed Ms. Oates that anyone could be a witness but she had to speak with her vocational rehabilitation counselor to discuss her accommodation needs.

97. Conflicts arising from Ms. Kidd's vacation and the counselor's schedule resulted in the meeting not being held until March 30th.

98. On or about March 16th Ms. Oates completed a form to appeal the administrative probation.

99. Ms. Oates argued that the action was unfair and improper in light of the fact that her pending accommodation request were ignored and that there had been no communication regarding the request since it was submitted on February 5th.

100. She further argued that had her accommodation request been addressed in a timely manner she would not have had an issue of attendance or tardiness.

101. During her rheumatologist visit on or about March 16th, Ms. Oates's blood work found the RA factor in her blood to be 549, or four times the level it was when she was first determined to be disabled in 1998.

102. On or about March 19th Ms. Oates submitted her appeal to Kay Gordon, Telamon's State Director in Indiana.

103. On or about March 30th a meeting was held between Ms. Oates, Ms. Kidd, Paul Reed, Ms. Oates's counselor, and her mother.

104. No representative from TR's or Telamon's human resources department was present.

105. Ms. Kidd asked Ms. Oates to identify the accommodation she sought to which Ms Oates suggested that flex time in the morning and omitting the additional physically demanding duties associated with the DWD, unrelated to the duties necessary for the TR case manager position.

106. Ms. Oates also informed Ms. Kidd that her doctor was ordering her a mobility chair, and the rheumatologist was about to start her on disease modifying medications, but it could take 30-60 days for the medications to become effective.

107. Ms. Kidd's only remark was that she was concerned about accessibility to the second building in a mobility chair.

108. Ms. Oates's counselor, Paul Reed, suggested that vocational rehabilitation could provide computer hardware/software to help with hand problems.

109. Ms. Kidd made no other remarks or suggestions and did not engage in any interactive dialogue during this meeting or at any other time.

110. On March 31st Ms. Oates received by email a summary statement of what took place during the meeting.

111. On April 1st Ms. Oates received a letter via email from L. Diane Swift denying her appeal of the administrative probation.

112. The denial was based upon a determination that Ms. Oates had received temporary accommodations in the form of approved leave without pay while awaiting the return of the doctor's form.

113. On April 2nd Ms. Kidd denied, in writing, Ms. Oates's accommodation request alleging that the contract under which Transition Resources operated required all employees to be in full time, forty hours per week, positions.

114. No other accommodations were offered or suggested nor were any additional meetings offered to discuss alternative accommodations.

115. On April 6th Ms. Kidd summoned Ms. Oates to her office and terminated her employment due to excessive absenteeism and tardiness.

116. Ms. Oates was given fifteen minutes to clear out her cubical, under supervision of Ms. Kidd, and she was escorted out the back door.

## V <u>CLAIM I</u>

**Telamon and Transition Resources violated 42 U.S.C. § 12101 *et seq.*
by failing to grant reasonable accommodations for a covered disability.**

Paragraphs (1) through (116) above are incorporated herein by reference as if included herein.

117. In pertinent part the ADA prohibits any covered entity from discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

118. Unlawful discrimination under the ADA includes both discriminatory discharge and the failure to provide reasonable accommodation.

119. To establish disability discrimination, a plaintiff must show that (1) they are disabled within the meaning of the ADA (2) they are qualified to perform the essential functions of the job either with or without reasonable accommodation and (3) they suffered from an adverse employment action because of their disability.

120. In 1996 Ms. Oates was diagnosed with rheumatoid arthritis (RA).

121. Ms. Oates major life activities, including the ability to walk, stand, sit and lift are substantially limited by her rheumatoid arthritis because it causes severe flare-ups and other medical complications.

122. During the major flare-up caused by Defendants' actions Ms. Oates was additionally limited in the major life activities of eating, sleeping and personal care.

123. In 1998 and again in 2002 she was determined to be disabled for the purposes of the Social Security Administration.

124. The severity of Ms. Oates condition establishes her as a disabled person within the meaning of the ADA.

125. The physical requirements identified both in the posted job description and reiterated in the interview process for a case manager required the ability to sit for extended periods, travel, the ability to analyze and solve problems, and ability to communicate.

126. Even with her RA condition, Ms. Oates was capable of fulfilling the physical requirements of a case manager.

127. Defendants, through their employee, Ms. Kidd, discriminated against Ms. Oates by forcing her to engage in activities beyond those identified in the job description for a case manager and refusing to afford her reasonable accommodations.

128. The additional activities were more physically demanding than those set forth and required for a case manager.

129. Ms. Oates's RA prevented her from being able to engage in the physical requirements of the additional activities without reasonable accommodations.

130. Defendants terminated Ms. Oates as a direct result of her not being able to engage in the additional activities due to her RA.

131. As a direct and proximate result of Defendants' discrimination Ms. Oates has been injured in, among other ways, the loss of her job, loss of the benefits and privileges of employment including insurance and social interaction.

## VI  COUNT II

### Retaliation as a direct result of seeking accommodations.

Paragraphs (1) through (131) above are incorporated herein by reference as if included herein.

132. An employee bringing a retaliation claim under the ADA may prevail by presenting either direct or indirect evidence of discrimination.

133. In an ADA retaliation case based on indirect evidence, an employee first must demonstrate a prima facie case of retaliation by establishing that: (1) they engaged in statutorily protected expression; (2) they suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action.

134. Ms. Oates's RA condition sufficiently impacts major life activities to rise to the level of a disability under the ADA.

135. On or about January 14, 2010 Ms. Oates notified her supervisor, Ms. Kidd, of her RA.

136. In February Ms. Oates contacted Ms. Kidd seeking reasonable accommodations for her RA condition in order to perform her duties as a case manager.

137. On or about March 8th Defendants, through their employee, Ms. Kidd, retaliated against Ms. Oates, summarily rejected and denied her pending request for reasonable accommodations by placing her on administrative probation due to "excessive absenteeism" directly related to her RA condition.

138. On April 2nd Defendants, through their employee, Ms. Kidd, retaliated against Ms. Oates by formally denying her accommodation request without discussion of alternatives or any additional meetings offered to discuss accommodations.

139. On April 6th Defendants, through their employee, Ms. Kidd, retaliated against Ms. Oates by terminating her employment due to excessive absenteeism and tardiness directly caused by the flares of her RA resulting from the additional physically demanding activities in which she was being forced to engage beyond those of a case manager.

140. Defendants, through their employee Ms. Kidd, retaliated against Ms. Oates by refusing to recommend her for an available part time position with the DWD, which Ms. Oates had informed Ms. Kidd she would be able to perform.

141. Any time Ms. Oates missed from work was directly related to her RA condition and Defendants' failure to afford her reasonable accommodations, i.e., its demand that she engage in activities that were outside of the physical requirements of job description of a case manager.

142. Defendants directly retaliated against Ms. Oates for requesting accommodations by refusing to engage in meaningful dialogue to identify reasonable accommodations that would allow her to perform her duties as a case manager.

143. Defendants retaliated against Ms. Oates by requiring her to continue to engage in physical activities outside the scope of those required for her job description as a case manager which it knew she was unable to perform due to her RA condition.

144. Defendants retaliated against Ms. Oates by terminating her for seeking reasonable accommodations to accomplish tasks that were unrelated to the job for which she was hired.

## VII  DAMAGES

Paragraphs (1) through (144) above are incorporated herein by reference as if included herein.

145. Based upon the evidence presented to support her claims, Ms. Oates has been injured in various ways, as set out below, and is entitled to damages including but not limited to the following.

146. Pursuant to 42 U.S.C. § 2000e-3, Ms. Oates is entitled to compensatory and punitive damages, against the Defendants for the losses she sustained as the result of their violations of her civil rights as protected by 29 U.S.C. § 12101 *et seq.*, and 29 U.S.C. § 12203.

147.  Ms. Oates is entitled to back wages and wages going forward in an amount to be determined from the date she was terminated until she is able to secure employment elsewhere.

148.  Ms. Oates seeks, as appropriate, attorney's fees, interest and costs and such other legal and equitable relief as the Court may deem appropriate.

WHEREFORE, Plaintiff, Ms. Oates, prays for relief against Defendants, Telamon Corporation and Transition Resources Corporation, under her claims against said Defendants as asserted above, and for all other relief just and proper in the premises.

### REQUEST FOR TRIAL BY JURY

Comes now Plaintiff, Ms. Oates, and requests a trial by jury with respect to all claims asserted herein.

Dated:  September 24, 2010

Respectfully Submitted,

/s/ J. Clayton Culotta
J. Clayton Culotta, #26733-11
815 E. Market Street
New Albany, Indiana 47150
Telephone No. (812) 941-8886
Facsimile No. (812) 941-8883
clayculotta@culottalaw.com